UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:

                                              **Case No. 13-14166-BKC-EPK**

**PHILIPPE CHOW BOCA, LLC,**                **Chapter 7**

      **Debtor.**

_____/

**MICHAEL R. BAKST, as Trustee in Bankruptcy**
**for PHILIPPE CHOW BOCA, LLC,**

        **Plaintiff,**                           **Adv.Case No.:**

**v.**

**STRATIS MORFOGEN,**

        **Defendant.**

_____/

**COMPLAINT TO AVOID AND TO RECOVER**
**FRAUDULENT TRANSFER, TO RECOVER AN IMPROPER DISTRIBUTION TO A**
**LIMITED LIABILITY COMPANY MEMBER, TO RECOVER DAMAGES**
**FOR BREACH OF FIDUCIARY DUTY AND/OR DUTY OF LOYALTY,**
**AND FOR OTHER RELIEF**

      The Plaintiff Michael R. Bakst (the "Plaintiff" or the "Trustee"), as Trustee in

Bankruptcy for Philippe Chow Boca, LLC (the "Debtor"), through undersigned counsel, sues the

Defendant Stratis Morfogen, and alleges in his Complaint to Avoid and to Recover Fraudulent

Transfer, to Recover an Improper Distribution to a Limited Liability Company Member, to

Recover Damages for Breach of Fiduciary Duty and/or Duty of Loyalty, and for Other Relief

(the "Complaint") as follows:

### Parties, Jurisdiction and Venue

      1.      The Plaintiff is the duly appointed Trustee of the Debtor.  The Debtor filed this

voluntary chapter 7 petition on February 25, 2013 (the "Petition Date").

2.      The Debtor was a Florida limited liability company.  The Debtor operated a restaurant in Palm Beach County, Florida for less than one year.

3.      Stratis Morfogen resides in New York and South Florida, and is an owner of the Debtor.

4.      The Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157 and 1334.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

6.      This adversary case is a core proceeding pursuant to 28 U.S.C. §157 (b)(2)(A), (E), (H), and (O).

## Factual Allegations

7.      The Debtor was formed on or about May 11, 2011 to operate a high-end Chinese restaurant in Boca Raton, Florida.  Stratis Morfogen is a part-owner of the Debtor.  Stratis Morfogen contributed no cash or tangible asset to the Debtor at any time, for his ownership interest or otherwise.

8.      Upon its formation, the Debtor's owners were David Lee, Stratis Morfogen, Steven Kantor, and Philippe Chau Chow (collectively, the "Owners").  None contributed any cash or tangible property at any time to the Debtor.

9.      After the Debtor's formation, but before it opened for business, the Owners sought investors to contribute cash to the Debtor in exchange for "limited partner" ownership interests in the Debtor.

10.     The Owners found four investors to contribute cash to the Debtor in exchange for unspecified "limited partner" shares in the Debtor.  On or about June 8, 2011, Steve Boxer contributed $200,000.00 in cash to the Debtor for an unspecified "limited partner" ownership

interest. On or about July 7, 2011, Steve Boxer contributed another $200,000.00 in cash to the Debtor for an additional unspecified "limited partner" ownership interest in the Debtor. On August 24, 2011, the Kleiner Group contributed $125,000.00 in cash to the Debtor for an unspecified "limited partner" ownership interest in the Debtor. On August 31, 2011, Marc Bell contributed $125,000.00 in cash to the Debtor for an unspecified "limited partner" ownership interest in the Debtor. These individuals and entities are collectively referred to as the "Limited Partners." In total, the Limited Partners contributed $650,000.00 in cash to the Debtor in exchange for unspecified "limited partner" ownership interests. The Owners remained owners of the Debtor as well after the cash contribution of the Limited Partners.

11.    Shortly after obtaining the $650,000.00 in cash from these "limited partners," the Owners caused the Debtor to make cash distributions to them on September 7, 2011 as follows: (1) $87,500.00 to David Lee; (2) $87,500.00 to Stratis Morfogen; (3) $87,500.00 to Steven Kantor; and (4) $77,500.00 to Philippe Chow Chau. A copy of a document reflecting the transfer to Stratis Morfogen is attached hereto as Exhibit "A." SOFA #10a also reflects these transfers. (ECF No. 1-1, p. 49.) In total, the Owners removed $340,000.00 in cash from the Debtor. The Debtor's restaurant had only opened for business in August of 2011, less than a month before these transfers.

12.    Stratis Morfogen did not provide any consideration to the Debtor for the $87,500.00 transfer. As a part-owner, Stratis Morfogen was an insider of the Debtor.

13.    The Debtor never operated with any kind of profit, always struggled to pay its bills, and was never able to pay all of its bills, either on-time or in-full. Some were never paid at all. Nonetheless, the Owners caused the Debtor to make the $87,500.00 transfer to Stratis Morfogen. In fact, this transfer and the others to the Owners totaling $340,000.00 occurred less

than a month after the Debtor opened its doors to the public when it had no operating history and lacked sufficient capital or revenue to sustain operations of any kind. Businesses which are just opening, and in particular, a restaurant, with no history of operations, do not distribute a significant amount of its cash equity infusions to non-cash contributing owners right after opening for business. In fact, two other restaurants owned and operated by Messrs. Kantor, Lee, Chow Chau, and Morfogen in South Florida had failed just prior to the Debtor opening for business.

14.    The $87,500.00 transfer to Stratis Morfogen, both alone, and certainly with the other three transfers to the other Owners, rendered the Debtor insolvent and/or with an unreasonably small capital. Alternatively, the Debtor was never solvent or never had a reasonable amount of capital.

15.    Stratis Morfogen remained an owner of the Debtor after the $87,500.00 transfer, so he retained the benefits of being an owner.

16.    The Debtor, the Owners and one or more of the Limited Partners had entered into an Operating Agreement which restricted the Owners' ability to take cash distributions from the Debtor. Distributions to the Owners were conditioned upon certain cash flow benchmarks. The Owners took these September 7, 2011 distributions without any cash flow history at all. Accordingly, the Owners took the distributions in violation of the Operating Agreement. A copy of what the Trustee believes reflects the terms of the Operating Agreement is attached as Exhibit "B."

17.    All conditions precedent to the initiation of this lawsuit have occurred or have been waived by Stratis Morfogen.

## COUNT I (ACTUAL FRAUD)
## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFER

**UNDER 11 U.S.C. §§ 544(b), 548(a)(1)(A), AND 550,**
**AND FLORIDA STATUTES §§ 726.105(1)(a) AND 726.108(1)**

18.      This is an adversary proceeding to recover a fraudulent transfer pursuant to 11

U.S.C. §§ 544(b), 548(a)(1)(A), and 550, and Florida's Uniform Fraudulent Transfer Act,

Florida Statute §§ 726.105(1)(a) and 726.108(1).

19.      Within two years prior to the Petition Date, the Debtor made the $87,500.00

transfer to Stratis Morfogen for his benefit.

20.      Stratis Morfogen caused the Debtor to make the $87,500.00 transfer to him with

the actual intent to hinder, delay, or defraud present and future creditors of the Debtor.

21.      Section 548(a)(1)(A) provides that:

(1) The trustee may avoid any transfer (including any transfer to or for the benefit
of an insider under any employment contract) of an interest of the debtor in
property, or any obligation (including any obligation to or for the benefit of an
insider under an employment contract) incurred by the debtor, that was made or
incurred on or within 2 years before the date of the filing of the petition, if the
debtor voluntarily or involuntarily-
(A) made such transfer or incurred such obligation with actual intent to hinder,
delay, or defraud any entity to which the debtor was or became, on or after the
date that such transfer was made or such obligation was incurred, indebted[.]

22.      Likewise, Florida Statute Section 726.105(1)(a) provides that:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a
creditor, whether a creditor's claim arose before or after the transfer was made or
the obligation was incurred, if the debtor made the transfer or incurred the
obligation:
(a) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

23.      The Debtor's $87,500.00 transfer to Stratis Morfogen is avoidable, and should be

avoided, pursuant to and under 11 U.S.C. §§ 544(b) and 548(a)(1)(A), and Florida Statute

§726.105(1)(a).

24.      Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of the

estate of the Debtor is authorized to the extent that its transfer of $87,5000.00 to Stratis

Morfogen is avoidable under 11 U.S.C. §§ 544(b) and 548(a)(1)(A).

25.    In addition, pursuant to 11 U.S.C. §544(b), the Trustee may avoid any transfer of an interest of the Debtor in property transferred for the benefit of Stratis Morfogen that is avoidable under applicable law (in this case, under Florida Statute §§ 726.105(1)(a) and 726.108) by a creditor holding an unsecured claim.  There is at least one actual holder of an unsecured claim pursuant to 11 U.S.C. § 502 who would have standing to assert a claim for relief under Florida Statutes Chapter 726 *et seq.*

WHEREFORE the Plaintiff/Trustee Michael R. Bakst, as Trustee in Bankruptcy for Philippe Chow Boca, LLC, demands judgment against Stratis Morfogen as follows: (i) determining that the $87,500.00 transfer to him from the Debtor is fraudulent and avoidable pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(A) and Florida Statutes §§ 726.105(1)(a) and 726.108, and avoiding it; (ii) entering judgment in favor of the Trustee against Stratis Morfogen for $87,500.00 pursuant to 11 U.S.C. §550, plus pre-judgment interest from the date of the transfer, post-judgment interest and costs of suit; and (iii) for such other relief as the Court deems just and proper.

## COUNT II (CONSTRUCTIVE FRAUD)
### AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFER
### UNDER 11 U.S.C. §§ 548(a)(1)(B) AND 550
### AND FLORIDA STATUTES §§ 726.105 (1)(B) AND 726.108(1)

26.    Paragraphs 1 through 17 inclusive are realleged and incorporated herein by reference.

27.    This is an adversary proceeding to recover a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550, and Florida Statute §§ 726.105(1)(b) and 726.108(1).

28.    Within two years prior to the Petition Date, the Debtor made the $87,500.00

transfer to Stratis Morfogen for his benefit.

29.     The Debtor received less than a reasonably equivalent value in exchange for making the $87,500.00 transfer to Stratis Morfogen.

30.     At the time of the $87,500.00 transfer to Stratis Morfogen, the Debtor was insolvent or became insolvent as a result thereof, the Debtor was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured, or the Debtor made such transfers to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment agreement and not in the ordinary course of business.

31.     Section 548(a)(1)(B) provides that:

(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under any employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment agreement and not in the ordinary course of business.

32.     Florida Statute § 726.105(1)(b) provides that:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a

creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation

(b) Without recurring a reasonably equivalent value in exchange for the transfer or obligation, and the debtor

1. Was engaged or was about to engage in a business or a transition for which the remaining assets of the debtor were unreasonably small in relation to the business or transition; or

2. Intended to incur, or believed as reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

33.    The $87,500.00 transfer to Stratis Morfogen is avoidable under 11 U.S.C. §§ 544(b) and 548(a)(1)(B), and Florida Statutes §§ 726.105(1)(b) and 726.108(1).

34.    Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of the estate is authorized to the extent that the transfer of $87,500.00 to Stratis Morfogen is avoided under 11 U.S.C. §§ 544(b) and 548(a)(1)(B) or applicable state law, here Florida Statutes §§ 726.105(1)(b) and 726.108(1).

WHEREFORE the Plaintiff/Trustee Michael R. Bakst, as Trustee in Bankruptcy for Philippe Chow Boca, LLC, demands judgment against the Defendant Stratis Morfogen as follows: (i) determining that the $87,500.00 transfer is fraudulent and avoidable pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B) and Florida Statutes §§ 726.105(1)(b) and 726.108(1); (ii) avoiding the $87,500.00 transfer and entering judgment in favor of the Trustee against Stratis Morfogen for $87,500.00 pursuant to 11 U.S.C. § 550, plus pre-judgment interest from the date of the transfer, post-judgment interest and costs of suit; and (iii) for such other relief as the Court deems just and proper.

### COUNT III (FLORIDA LIMITED LIABILITY COMPANY ACT)
### RECOVERY OF IMPROPER DISTRIBUTION
### UNDER FLA. STAT. § 608.426(1) AND (3)

35.    Paragraphs 1 through 17 inclusive are realleged and incorporated herein by reference.

36.    This is an adversary proceeding to recover the Debtor's improper distribution to a member under the Florida Limited Liability Company Act.

37.    Florida Statute § 608.426(1) prohibits a limited liability company from making a distribution to a member if, after the distribution, the limited liability company would be insolvent.

38.    The Debtor was insolvent after making distribution of the $87,500.00 to Stratis Morfogen.

39.    Florida Statute § 608.426(3) provides that the recipient of a distribution made in violation of § 608.426(1) is personally liable to the limited liability company for that distribution.

40.    Stratis Morfogen is liable to the Debtor, and accordingly, to the Trustee for his receipt of the wrongful $87,500.00 distribution from the Debtor.

41.    Pursuant to 11 U.S.C. § 550(a), the recovery of property for the benefit of the estate is authorized to the extent that the transfer of $87,500.00 to Stratis Morfogen is subject to recovery under 11 U.S.C. §§ 544(b) and applicable state law, here Florida Statute §§ 608.426(1) and (3).

WHEREFORE the Plaintiff/Trustee Michael R. Bakst, as Trustee in Bankruptcy for Philippe Chow Boca, LLC, demands judgment against the Defendant Stratis Morfogen as follows: (i) determining that the $87,500.00 transfer is an improper distribution under Florida Statute § 608.426(1) and recoverable pursuant to 11 U.S.C. §§ 544(b) and Florida Statutes § 608.426(3); (ii) avoiding and/or recovering the $87,500.00 distribution and entering judgment in favor of the Trustee against Stratis Morfogen for $87,500.00 pursuant to 11 U.S.C. § 550, plus pre-judgment interest from the date of the distribution, post-judgment interest and costs of suit; and (iii) for such other relief as the Court deems just and proper.

## COUNT IV-RECOVERY OF AVOIDED TRANSFERS
## PURSUANT TO II U.S.C. § 550

42.     Paragraphs 1 through 17 inclusive are realleged and incorporated herein by reference.

43.     This is an adversary proceeding to recover a fraudulent transfer and a wrongful distribution to a member of a limited liability company that has been avoided pursuant to 11 U.S.C. §§ 544 and 548, and the Florida Uniform Fraudulent Transfer Act, and/or recovered under Florida Statute § 608.426(1) and (3).

44.     The $87,500.00 transfer from the Debtor to Stratis Morfogen has been, will be, or are subject to being avoided and/or recovered by the United States Bankruptcy Court for the Southern District of Florida as set forth in this adversary proceeding.

45.     As a result, the Trustee may recover the amount or value of the transfer received by Stratis Morfogen from it pursuant to 11 U.S.C. § 550.

WHEREFORE the Plaintiff/Trustee Michael R. Bakst, as Trustee in Bankruptcy for Philippe Chow Boca, LLC, demands judgment against the Defendant Stratis Morfogen as follows: (i) for the amount of the $87,500.00 transfer received by him or for his benefit pursuant to 11 U.S.C. § 550, plus pre-judgment interest from the date of the transfer, post-judgment interest and costs of suit; and (ii) for such other relief as the Court deems just and proper.

## COUNT IV-BREACH OF FIDUCIARY DUTY

46.     Paragraphs 1 through 17 inclusive are realleged and incorporated herein by reference.

47.     This is an adversary proceeding to recover damages for breach of fiduciary duty and/or duty of loyalty.

48.     Stratis Morfogen was the Debtor's Managing Member at all times.  Accordingly,

he owed the Debtor fiduciary duties and duties of loyalty under both Florida Statute §
608.4225(1) and common law.

49.    Stratis Morfogen breached his fiduciary duty and/or duty of loyalty to the Debtor.
Stratis Morfogen caused and/or permitted the Debtor to purchase used restaurant furniture and
equipment that had little to no value for $150,000.00 from entity owned and controlled by Stratis
Morfogen and the Owners from another failed restaurant.  The used furniture and equipment was
worth so little that when the Debtor ultimately failed less than a year after it opened and acquired
the used furniture and equipment, the Debtor simply abandoned it to its landlord without a
second thought, and with no accounting or credit against outstanding sums due to the landlord by
the Debtor.

50.    While the Debtor was operating, it also failed to pay state sales tax.  Instead of
paying its state sales tax, the Debtor made other payments, including those to or for the benefit or
its member or insiders.  Stratis Morfogen made this decision and caused the Debtor to incur
substantial liability to the state of Florida for unpaid sales tax.

51.    As a result of Stratis Morfogen's breaches of his fiduciary duties and/or duties of
loyalty to the Debtor, the Debtor suffered damages that the Trustee may recover.

WHEREFORE the Plaintiff/Trustee Michael R. Bakst, as Trustee in Bankruptcy for
Philippe Chow Boca, LLC, demands judgment against the Defendant Stratis Morfogen for
$150,000.00 paid by the Debtor for the used restaurant furniture and equipment, and the amount
of unpaid sales tax due by the Debtor to the state of Florida, plus pre-judgment interest, post-
judgment interest and costs of suit, and for such other relief as the Court deems just and proper.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

Dated: September 5, 2013.

**GREENSPOON MARDER, P.A.**

*/s/ G. Steven Fender*

MICHAEL R. BAKST, ESQ.
Florida Bar No. 866377
G. STEVEN FENDER, ESQ.
Attorney for Trustee
Florida Bar No. 060992
250 S. Australian Avenue, Suite 700
West Palm Beach, FL 33401
Telephone:  (561) 838-4509
Facsimile:  (561) 514-3409

TO:
Stratis Morfogen
930 5th Avenue, Apartment 12E
New York, NY 10021

14792178v1

# GreenspoonMarder
### ATTORNEYS AT LAW

From the desk of:
G. Steven Fender, Esq.
One Clearlake Centre, Suite 700
250 Australian Avenue
West Palm Beach, Florida 33401
Phone: 561.227.2370
Fax: 561.653.3937
Direct Phone: 561.838.4509
Direct Fax: 561.514.3409
Email: steven.fender@gmlaw.com

**888.491.1120**
**www.gmlaw.com**

March 11, 2013

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Stratis Morfogen
1241 NE 81st Street
Miami, FL 33138

Re: **In re Philippe Chow Boca LLC**
   **Case No. 13-14166-BKC-EPK**

Dear Mr. Morfogen:

On February 25, 2013, Philippe Chow Boca LLC (the "Debtor") filed a voluntary Chapter 7 bankruptcy petition in the Southern District of Florida in Case Number 13-14166-BKC-EPK. Michael R. Bakst (the "Trustee") was appointed as the Chapter 7 Trustee, and has hired this firm to represent him. For your reference, I have enclosed a copy of the Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines.

It has come to my attention that the Debtor made a $87,500.00 payment to you, or for your benefit, from the Debtor which would qualify as a fraudulent transfer pursuant to 11 U.S.C. § 548 and/or Chapter 726 of the Florida Statutes. This payment was made to you on or about August 12, 2011. I have enclosed the Debtor's 2011 K-1 issued to you reflecting this payment.

This letter is being sent to demand return of the $87,500.00 to the Trustee <u>within ten (10) days from the date of this letter</u>. Your check should be made payable to Michael R. Bakst, Trustee in Bankruptcy for Philippe Chow Boca LLC, and should be sent to the attention of Michael R. Bakst, Trustee, c/o G. Steven Fender, Esq., 250 S. Australian Avenue, Suite 700, West Palm Beach, Florida 33401. If payment is not made, the Trustee may have no other choice but to bring an adversary proceeding against you within the Bankruptcy Court here in Florida. If you have any explanation for receiving this payment which would reflect it was not a fraudulent transfer under Bankruptcy and Florida and law, please forward that explanation, along with all supplementing documentation to me within ten (10) days.

Be guided accordingly.   EXHIBIT "A"

2314677:1

**THIS IS AN ATTEMPT TO COLLECT A DEBT.  ANY INFORMATION OBTAINED
WILL BE USED FOR THAT PURPOSE.**

Very truly yours,

GREENSPOON MARDER, P.A.

G. Steven Fender, Esq.

GSF/kw
Enclosures

12314677:1

# UNITED STATES BANKRUPTCY COURT
### Southern District of Florida
#### www.flsb.uscourts.gov

## Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines

A chapter 7 bankruptcy case concerning the debtor listed below was filed on 2/25/13.

You may be a creditor of the debtor. **This notice lists important deadlines.** You may want to consult an attorney to protect your rights. All documents filed in the case may be accessed electronically via CM/ECF including at the public access terminals in every clerk's office. **NOTE: The staff of the bankruptcy clerk's office cannot give legal advice.**

### Creditors − Do not file this notice in connection with any proof of claim you submit to the court.
#### See Reverse Side For Important Explanations and SDFL Local Court Requirements.

Debtor(s) name(s) and address(es) (for names include married, maiden and trade used by the debtor(s) in the last 8 years):
Philippe Chow Boca LLC
200 Palmetto Park Rd E
Boca Raton, FL 33432

| Case Number: 13-14166-EPK | Last four digits of Social-Security or Individual Taxpayer-ID (ITIN) No(s)./Complete EIN: |
|---|---|

| Attorney for Debtor(s) (or Pro Se Debtor) name and address: Gary L Blum 3111 Stirling Rd Fort Lauderdale, FL 33312 Telephone number: (954) 987-7550 | Bankruptcy Trustee (name and address): Michael R Bakst PMB 702 222 Lakeview Ave #160 West Palm Beach, FL 33401 Telephone number: 561-838-4539 |
|---|---|

## MEETING OF CREDITORS

Date: **March 27, 2013**      Time: **04:00 PM**
Location: **Flagler Waterview Bldg, 1515 N Flagler Dr Rm 870, West Palm Beach, FL 33401**

**WARNING TO DEBTOR: Without further notice or hearing the court may dismiss your case for failure of the debtor to appear at the meeting of creditors or failure to timely file required schedules, statements or lists.**

### Deadlines:
Documents submitted for filing must be *received* by the bankruptcy clerk's office by the following deadlines:

#### Deadline to File a Proof of Claim:
For all creditors (except a governmental unit): 6/25/13      For a governmental unit:

#### Deadline to Object to Trustee's Report of Abandonment:
See explanation on reverse.

#### Creditor with a Foreign Address
A creditor to whom this notice is sent at a foreign address should read the information under "Claims" on the reverse side.

## Creditors May Not Take Certain Actions:

In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay. If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized. Consult a lawyer to determine your rights in this case.

| Address of the bankruptcy clerk's office where assigned judge is chambered: Flagler Waterview Bldg 1515 N Flagler Dr #801 West Palm Beach FL 33401 Telephone: 561-514-4100 | |
|---|---|
| **Hours Open:** Monday − Friday 8:30 AM − 4:00 PM Closed all Legal Holidays | **Clerk of the Bankruptcy Court:** Katherine Gould Feldman **For:** Judge Erik P. Kimball **Date:** 2/25/13 |

EXPLANATIONS FORM B9D (2/4/13)

| | |
|---|---|
| Filing of Chapter 7 Bankruptcy Case | A bankruptcy case under Chapter 7 of the Bankruptcy Code (title 11, United States Code) has been filed in this court by or against the debtor(s) listed on the front side (or the existing case under another chapter has been converted to chapter 7). |
| Creditors Generally May Not Take Certain Actions | Prohibited collection actions are listed in Bankruptcy Code § 362. Common examples of prohibited actions include contacting the debtor by telephone, mail or otherwise to demand repayment; taking actions to collect money or obtain property from the debtor; repossessing the debtor's property; and starting or continuing lawsuits or foreclosures. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay. |
| Meeting of Creditors | A meeting of creditors is scheduled for the date, time and location listed on the front side. *The debtor's representative must be present at the meeting to be questioned under oath by the trustee and by creditors.* **Creditors are welcome to attend, but are not required to do so.** The meeting may be continued and concluded at a later date specified in a notice filed with the court. As mandated by the Department of Homeland Security, ALL visitors (except minors accompanied by an adult) to any federal building or courthouse, must present a current, valid, government issued photo identification (e.g., drivers license, state identification card, passport, or immigration card). |
| Claims | A Proof of Claim is a signed statement describing a creditor's claim. A secured creditor retains rights in its collateral regardless of whether that creditor files a Proof of Claim. If you do not file a Proof of Claim by the "Deadline to file a Proof of Claim" listed on the front side, you might not be paid any money on your claim from other assets in the bankruptcy case. To be paid, you must file a Proof of Claim even if your claim is listed in the schedules filed by the debtor. However, if this is a converted case, all claims filed under the initial chapter shall be deemed filed and need not be refiled. Filing a Proof of Claim submits the creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a Proof of Claim may surrender important nonmonetary rights, including the right to a jury trial. **Filing Deadline for a Creditor with a Foreign Address:** The deadlines for filing claims set forth on the front of this notice apply to all creditors. If this notice has been mailed to a creditor at a foreign address, the creditor may file a motion requesting the court to extend the deadline.<br>Claims should be filed using the Official B10 Proof of Claim form available at any bankruptcy clerk's office or on the court's website at: www.flsb.uscourts.gov, and delivered or mailed to the clerk's office address listed on the front of this notice. To receive acknowledgment of receipt by the clerk, enclose a copy of the claim and an adequate sized stamped self addressed envelope. As an alternative filing method, any creditor with internet access may file a proof of claim electronically and print a copy of the claim at the time of filing by using the electronic claims filing program available on the court website: www.flsb.uscourts.gov. *Do not include this notice with any filing you make with the court.* |
| Liquidation of the Debtor's Property and Payment of Creditors' Claims | The bankruptcy trustee listed on the front side of this notice will collect and sell the debtor's property that is not exempt. If the trustee can collect enough money, creditors may be paid some or all of the debts owed to them, in the order specified by the Bankruptcy Code. To make sure you receive any share of that money, you must file a Proof of Claim, as described above. |
| Bankruptcy Clerk's Office | Documents filed conventionally in paper may be filed at any bankruptcy clerk's office. Documents may be viewed in electronic format at any clerk's office public terminal (no charge for viewing) or via PACER ON THE INTERNET (charges apply). Case filing information and unexpired deadline dates can be obtained by calling the Voice Case Information System: (305)536-5979 or (800)473-0226. |
| Creditor with a Foreign Address | Consult a lawyer familiar with United States bankruptcy law if you have any questions regarding your rights in this case. |
| Abandonment of Property by Trustee | Pursuant to Local Rule 6007-1(A), the trustee will abandon at the meeting of creditors all property that the trustee has determined is of no value to the estate and file a report within 2 business days. Objections to the report must be filed within 14 days of the meeting. |
| Electronic Bankruptcy Noticing | Parties can now choose to receive all notices (including attachments) served by the clerk's office electronically instead of via US mail. For information on or to register for this free service, contact the Bankruptcy Noticing Center at ebn.uscourts.gov |
| Translating Services | Language interpretation of the meeting of creditors will be provided to the debtor at no cost, upon request to the trustee, through a telephone interpreter service. Persons with communications disabilities should contact the U.S. Trustee's office to arrange for translating services at the meeting of creditors. |

— Refer to Other Side for Important Deadlines and Notices —

| Schedule K-1 | **2011** | 651111 |
|---|---|---|

**Schedule K-1 (Form 1065)**
Department of the Treasury
Internal Revenue Service

For calendar year 2011, or tax
year beginning 5/15, 2011
ending 12/31, 2011

☐ Final K-1  ☐ Amended K-1   OMB No. 1545-0099

## Partner's Share of Income, Deductions, Credits, etc.   ▶ See separate instructions.

### Part I Information About the Partnership

**A** Partnership's employer identification number
▆▆▆▆▆▆▆

**B** Partnership's name, address, city, state, and ZIP code

PHILIPPE CHOW BOCA LLC
250 WEST 57TH STREET STE 1429
NEW YORK, NY 10107

**C** IRS Center where partnership filed return
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II Information About the Partner

**E** Partner's identifying number
▆▆▆▆▆▆

**F** Partner's name, address, city, state, and ZIP code

STRATIS MORFOGEN
1241 NE 81ST STREET
MIAMI, FL 33138

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I** What type of entity is this partner? INDIVIDUAL

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 17.5 % | 18.75 % |
| Loss | 17.5 % | 18.75 % |
| Capital | % | % |

**K** Partner's share of liabilities at year end:
| | |
|---|---|
| Nonrecourse | $ 130,367. |
| Qualified nonrecourse financing | $ |
| Recourse | $ |

**L** Partner's capital account analysis:
| | |
|---|---|
| Beginning capital account | $ 0. |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ -110,380. |
| Withdrawals and distributions | $ ( 87,500.) |
| Ending capital account | $ -197,880. |

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

### Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) -106,572. | 15 N | Credits | 3,357. |
| 2 | Net rental real estate income (loss) | 16 | Foreign transactions | |
| 3 | Other net rental income (loss) | | | |
| 4 | Guaranteed payments | | | |
| 5 | Interest income | | | |
| 6a | Ordinary dividends | | | |
| 6b | Qualified dividends | | | |
| 7 | Royalties | | | |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items | |
| 9b | Collectibles (28%) gain (loss) | | | |
| 9c | Unrecaptured section 1250 gain | | | |
| 10 | Net section 1231 gain (loss) | 18 C | Tax-exempt income and nondeductible expenses | 3,399. |
| 11 C | Other income (loss) | | | |
| 12 | Section 179 deduction | 19 A | Distributions | 87,500. |
| 13 A | Other deductions 409. | 20 | Other information | |
| L* | 1,400. | B | | 1,401. |
| 14 | Self-employment earnings (loss) | | | |

*See attached statement for additional information.

FOR IRS USE ONLY

3

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.

PARTNER 1

Schedule K-1 (Form 1065) 2011
PTPA0312 08/8/11

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

Philippe Chow Boca, LLC

EXHIBIT "*B*"

Limited Liability Company Operating Agreement

of

Philippe Chow Boca Limited Liability Company

This Limited Liability Company Operating Agreement of Philippe Chow Boca, L.L.C., a limited liability company organized pursuant to the Florida Limited Liability Company Law, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement.

ARTICLE I
DEFINITIONS

For purposes of this Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1  Act.  The Florida Limited Liability Company Law and all amendments to the Act.

1.2  Additional Contribution.  An additional Capital Contribution payable by the Members to the Company pursuant to Article VIII.

1.3  Additional Contribution Share.  A Member's proportionate share of an Additional Contribution, equal to the product of (A) such Member's Sharing Ratio and (B) the total of such Additional Contribution being made by all Members.

1.4  Agreement.  This Limited Liability Company Operating Agreement including all amendments adopted in accordance with the Agreement and the Act.

1.5  Articles.  The Articles of Organization of the Company, as amended from time to time, and filed with the Florida Department of State, Division of Corporations.

1.6  Assignee.  A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.7  Bankrupt Person. A Person who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code by voluntary or involuntary petition, or (2) has initiated, either in an original proceeding or by way of answer in any state insolvency or receivership Proceeding, an action for liquidation, arrangement, composition, readjustment, dissolution, or similar relief.

1.8    Business Day.  Any day other than Saturday, Sunday or any legal holiday observed in the State of Florida.

1.9    Capital Account.  The account maintained for a Member or Assignee determined in accordance with Article VIII.

1.10   Capital Contribution.  Any contribution of Property or services made by or on behalf of a Member or Assignee.

1.11   Commitment.  The Capital Contributions that a Member is obligated to make, including a Member's Initial Capital Contribution and any Additional Contribution Share of a Member.

1.12   Company. Philippe Chow Boca, L.L.C., a limited liability company formed under the laws of Florida, and any successor limited liability company.

1.13   Default Interest Rate.  The prime rate published by the Wall Street Journal for the last Business Day on which a Commitment is payable.

1.14   Delinquent Member.  A Member who has failed to meet the Commitment of that Member.

1.15   Disposition (Dispose).  Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.16   Dissociation.  Any action which causes a Person to cease to be a Member as described in Article XII hereof.

1.17   Dissolution Event.  An event, the occurrence of which will result in the dissolution of the Company under Article XIII.

1.18   Distribution.  A transfer of Property to a Member on account of a Membership Interest as described in Article IX.

1.19   Effective Date. February ___, 2011.

1.20   Fiscal Year.  The calendar year.

1.21   Initial Capital Contribution.  The Capital Contribution agreed to be made by the Members as described in Article VIII.

1.22   Initial Membership Interest.  The Initial Membership Interest set forth in Schedule A.

1.23   Initial Sharing Ratio.   The Initial Sharing Ratio set forth in Schedule A.

1.24   Management Right.   The right of a Member to participate in the management of the Company, to vote on any matter, and to grant or to withhold consent or approval of actions of the Company.

1.25   Managing Member.   A Member (or the Members) selected to manage the affairs of the Company under Article VII hereof.

1.26   Member.   A Person executing the Agreement as a Member, and a Substitute Member.

1.27   Membership Interest.   The rights of a Member to Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company, and, to the extent permitted by this Agreement, to possess and exercise Management Rights.

1.28   Net Cash Flow.   With respect to any fiscal period of the Company, all revenues of the Company during that period decreased by (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) reserves for contingencies and working capital, established in such amounts as the Managing Member may determine, (d) repayment of principal on any financing and (e) taxes not based upon income of the Company.

1.29   Organization.   A Person other than a natural person, including without limitation corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, business trusts and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

1.30   Person.   An individual, trust, estate, or any Organization permitted to be a member of a limited liability company under the laws of the State of Florida.

1.31   Principal Office.   The Principal Office of the Company set forth in Section 2.6.

1.32    Proceeding.   Any administrative, judicial, or other adversary proceeding, including without limitation litigation,
arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

1.33    Property.   Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

1.34    Schedule A.   Schedule A to this Agreement setting forth the name, address, Initial Capital Contribution, number of Units, Initial Membership Interest and Initial Sharing Ratio of each Member.

1.35    Sharing Ratio.   A percentage representing each Member's Membership Interest in the Company.   The Initial Membership Interest and Sharing Ratio of each Member is set forth in Schedule A hereof, and Schedule A shall be amended as necessary to conform to any changes thereof agreed to by the Members or otherwise effectuated by the provisions of this Agreement.   In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

1.36    Substitute Member.   An Assignee who has been admitted to all of the rights of membership pursuant to Section 11.3 of the Agreement.

1.37    Tax Characterization and Additional Tax Terms.   It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes.   For such purpose, (i) the Company shall be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, (ii) all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Section 8.4 and the provisions of Article IX) and in the provisions of the Code and Tax Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively. In addition, the following terms shall have the following meanings:

(a)    Adjusted Capital Account Deficit shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)   Credit  to  such  Capital  Account  the  minimum  gain chargeback that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations; and

(ii) Debit to such Capital Account the items described in Sections   1.704-1(b)(2)(ii)(d)(4),   1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d)  of  the  Tax  Regulations  and  shall  be interpreted consistently therewith.

(b)   Code shall mean the Internal Revenue Code of 1986.

(c)   Nonrecourse  Deductions  has  the  meaning  set  forth  in Section 1.704-2(b)(1) of the Tax Regulations.

(d)   Nonrecourse  Liability  has  the  meaning  set  forth  in Section 1.704-2(b)(3) of the Tax Regulations.

(e)   Partner Nonrecourse Debt has the meaning set forth  in Section  1.704-2(b)(4) of the Tax Regulations.

(f)   Partner Nonrecourse Debt Minimum Gain means an  amount, with  respect to each Partner Nonrecourse Debt, equal  to the Partnership Minimum Gain that would result if such  Partner Nonrecourse Debt were treated as a Nonrecourse  Liability, determined in accordance with Section 1.704-2(i)(3)  of the Tax Regulations.

(g)   Partner  Nonrecourse  Deductions  has  the  meaning  set Forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Tax Regulations.

(h)   Partnership Minimum Gain has the meaning set forth  in Sections   1.704-2(b)(2)   and   1.704-2(d)   of   the   Tax Regulations.

(i)   Profits and Losses shall mean, for each Fiscal  Year, an amount equal to the Company's taxable income or loss  for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in  taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.37(i) shall be added to such taxable income or loss;

(ii) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Tax Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.37(i), shall be subtracted from such taxable income or loss;

(iii) Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Sections 9.4 or 9.5 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 9.4 or 9.5 shall be determined by applying rules analogous to those set forth in clauses (i) through (iii) above.

(j) Tax Regulations shall mean the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Tax Regulations may be amended from time to time. All references herein to a specific section of the Tax Regulations shall be deemed also to refer to any corresponding provision of succeeding Tax Regulations.

1.38 Unit. One of the 100 units of Membership Interest that are authorized to be issued under this Agreement. Each Unit represents a Membership Interest with an Initial Sharing Ratio of one (1.0) percent (1.00%), subject to adjustment as provided herein. A Unit is divisible into fractional parts. References to Units herein shall be solely for the purpose of certifying the Membership Interests authorized hereunder. Voting, the granting or withholding of consents or approvals, and allocation of Profits and Losses and Distributions shall be made pursuant to the applicable provisions of this Agreement without reference to the number of Units held by Members. The Managing Member may, from time to time, cancel and re-issue Unit certificates such that the Unit certificates comport with the then-Sharing Ratios of the Members.

ARTICLE II

FORMATION

2.1    Organization.   The Members hereby organize the Company as a Florida limited liability company, but agree that all matters relating to the interpretation and enforcement of the provisions of this Agreement shall be pursuant to the provisions of the Act.

2.2    Agreement.  For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing the Agreement hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended.   It is the express intention of the Members that the Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of the Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Tax Regulations or is expressly prohibited or ineffective under the Act, the Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule.   To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be deemed to be amended to the least extent necessary in order to make the Agreement effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3    Name.   The name of the Company is Philippe Chow Boca L.L.C., and all business of the Company shall be conducted under that name.

2.4    Term.   The Company shall be dissolved and its affairs wound up in accordance with the Act and the Agreement on June 1, 2030, unless the term shall be extended by amendment to the Agreement and the Articles, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Agreement.

2.5    Registered Agent and Office.  The registered agent for the service of process and the registered office shall be that Person and location reflected in the Articles.   The Managing Member, may, from time to time, change the registered agent or office through appropriate filings with the Department of State of Florida.   In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Member shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.  If the Managing Member shall fail to designate a replacement registered agent or change of address of the registered office, any Member may designate a replacement registered

agent or file a notice of change of  address.

2.6    Principal Office.   The Principal Office of the Company shall be located at

<u>399 Jericho Turnpike</u>
<u>Jericho, NY 11753</u>

2.7    Publication.   Within 120 days after the Effective Date, the Managing Member shall cause a notice containing the substance of the Articles, in the form required by Florida Law, to be published once in each week for six successive weeks in two newspapers of the county in which the Principal Office is located.


ARTICLE III
PURPOSE; NATURE OF BUSINESS

The business purpose of the Company is to use "engage in any and all business activities permitted under the laws of the State of Florida.   The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Article III.   The Company exists only for the purpose specified in this Article III, and may not conduct any other business without the unanimous consent of the Members.   The authority granted to the Managing Member hereunder to bind the Company shall be limited to actions necessary or convenient to this business.


ARTICLE IV
ACCOUNTING AND RECORDS

4.1    Records to be Maintained.   The Company shall maintain the following records at the Principal Office:

(a)    a current list of the full name set forth in alphabetical order and last known mailing address of each Member, together with the information set forth on Schedule A relating to each Member's Initial Capital Contribution, number  of Units, Membership Interest and Sharing Ratio;

(b)   a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any such amendment has been executed;

(c)   a copy of the Company's federal, state and local income or information tax returns and reports for the three most recent Fiscal Years;

(d)   a copy of this Agreement including all amendments thereto; and

(e)   the Company's books and records, including financial statements of the Company, which shall be open to inspections by the Members or their agents at reasonable times.

4.2   Reports to Members.  The Managing Member shall provide reports, including a balance sheet, statement of profit and loss and changes in Members' accounts, and a statement of cash flows, at least annually to the Members allowing for a reasonable time for their preparation after year-end.  Notwithstanding the foregoing, any Member shall, at such Member's own expense, have the right to inspect (or designate an agent to inspect) any and all books and records of the Company at any reasonable time.

4.3   Tax Returns and Reports.  The Managing Member, at Company expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and shall prepare and deliver to each Member, within ninety (90) days after the expiration of each Fiscal Year, and at Company expense, all information returns and reports required and reports by the Code and Tax Regulations and Company information necessary for the preparation of the Members' federal income tax returns.

ARTICLE V
NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as stated on Schedule A.

ARTICLE VI

RIGHTS AND DUTIES OF MEMBERS

6.1     Management Rights.   No Member other than the Managing  Member shall have authority to bind the Company on any  Management Right except that (a) the assignment of a Membership Interest and the admission of a Substitute Member shall require the approvals set forth in Sections 11.2 and 11.3, and (b) the following actions shall require the consent of all of the Members:

(a)  any amendment to the Agreement or to the Articles;

(b)   the sale of Company Property other than in the ordinary course of business;

(c)   the merger or consolidation of the Company with any other Person;

(d)   the continuation of the Company after a Dissolution Event;

(e)   the borrowing of funds or the pledging, mortgaging  or otherwise encumbering of any Company Property, except in  the ordinary course of business;

(f)   the admission of a new Member;

(g)  the payment of compensation to the Managing  Member(s); and

(h)   the requirement that Additional Contributions be  made.

6.2     Liability of Members.   No Member shall be liable as such  for the liabilities of the Company.

6.3     Indemnification.   A Member shall indemnify the Company  for any costs or damages incurred by the Company as a result  of any unauthorized action by such Member.

6.4     Representations and Warranties.  Each Member, and in the   case of a trust or other entity, the person(s) executing the   Agreement on behalf of the entity, hereby represents and  warrants to the Company and each other Member that:

(a) if that Member is an entity, it has power to enter into the Agreement and to perform its obligations hereunder and that the person(s) executing the Agreement on behalf of the entity has the power to do so; and

(b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest. The Members acknowledge that their interests in the Company have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.5   Conflicts of Interest.

(a)   A Member, including a Managing Member, shall be entitled to enter into transactions that may be considered to be competitive with the Company, it being expressly understood that Members may enter into transactions that are similar to the transactions into which the Company may enter. Notwithstanding the foregoing, Members shall account to the Company and hold as trustee for it any Property, profit, or benefit derived by the Member, without the consent of all of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b)   A Member, including a Managing Member, does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company, and provided further that the interested Member shall have fully disclosed the details of such transaction to all other Members prior to such transaction being entered into.

(c)   The Members acknowledge that Philippe Chow's Membership and his reputation are a valuable asset of the Company. Therefore, notwithstanding anything to the contrary contained in this Section 6.5, Philippe Chow agrees that, for so long as the Company is carrying on the business of operating the restaurant contemplated by the parties' investment in the Company, he will not open, be employed by, consult for, invest in or become affiliated with, directly or indirectly, any restaurant in Florida without the consent of all Member, which consent may be withheld in the sole discretion of the Members.

(d) No other Member's likeness or affiliation by use of name or reputation shall be used for the benefit of the Company without their consent.


## ARTICLE VII
## MANAGING MEMBER

7.1   Managing Member(s).  Except as otherwise provided in the Agreement, the management of the Company and all decisions concerning the business affairs of the Company shall be made by the Managing Member(s).  The initial Managing Member(s) shall be: Steve Kantor, Stratis Morfogen and David Lee.

7.2   Term of Office as Managing Member.  Each Managing Member shall serve until the Dissociation of such Managing Member or any removal of such Managing Member pursuant to Section 7.7.

7.3   Authority of Managing Member to Bind the Company. Only the Managing Member and authorized agents of the Company shall have the authority to bind the Company. Subject to Section 6.1, the Managing Member has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company (as described in Article III), including, without limitation:

(a)   the institution, prosecution and defense of any Proceeding in the Company's name;

(b)   the purchase, receipt, lease or other acquisition, ownership, holding, improvement, use and other dealing with Property, wherever located;

(c)   the sale, conveyance, mortgage, pledge, lease, exchange, and other disposition of Property;

(d)   the entering into of contracts and guaranties, incurring of liabilities; borrowing of money, issuance of notes, bonds, and other obligations, and the securing of any of its obligations by mortgage or pledge of any of its Property or income;

(e)   the lending of money, investment and reinvestment of the Company's funds, and receipt and holding of Property as security for repayment;

(f)     the   conduct   of   the   Company's   business,   the
establishment of   Company offices, and the exercise of the
powers of the Company;

(g)    the hiring and appointment of employees and agents  of
the    Company,  the   defining   of   their   duties   and   the
establishment of their compensation, and the dealing with
trades people, accountants and attorneys, on such terms as
the  Managing Member shall determine;

(h)     the  purchase  of  liability  and  other  insurance  to
protect the Company's business and Property;

(i) the indemnification of any Person within the ordinary
course of the Company's business;

(j)   the establishment of reserve funds of the Company   to
provide    for    future    requirements    for    operations,
contingencies or any other purpose that the Managing Member
deems necessary or appropriate; and

(k)    the making of such elections under the Code and Tax
Regulations and other relevant tax laws as to the treatment
of items of Company income, gain, loss, deduction and credit,
and as to all other  relevant matters as the Managing Member
deems necessary or appropriate, including without limitation,
elections  referred  to  in  Section  754  of  the    Code,  the
determination  of  which  items  of  cash  outlay  shall  be
capitalized or treated as current expenses, and the selection
of the method of accounting and bookkeeping procedures to be
used by the Company.

7.4    Actions of the Managing Member.   The Managing Member
has    the  power  to  bind  the  Company  as  provided  in  this
Article VII.   No Person dealing with the Company shall have
any obligation to inquire into the power or authority of the
Managing Member   acting on behalf of the Company.   If there
is more than one  Managing Member, the Managing Members shall
manage the Company    by the affirmative vote of all the
Managing Members.

7.5    Compensation of Managing Member.   The Managing Member
shall be reimbursed for all reasonable expenses incurred in
managing the Company and shall be entitled to compensation,
in   an amount to be determined from time to time by consent
of all    of the Members.    The Managing Member shall not be
required to devote full time to the management of the Company
business,    but  only  so  much  time  as  shall  be  necessary  or
appropriate for  the proper management of such business.

7.6   Managing Member's Standard of Care.  Each Managing Member shall discharge the Managing Member's duties to the Company and the other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances. In discharging its duties, a Managing Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any Person as to matters the Managing Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid. The Company shall indemnify and hold harmless each Managing Member against any loss, damage or expense (including attorneys' fees) incurred by the Managing Member as a result of any act performed or omitted on behalf of the Company or in furtherance of the Company's interests without, however, relieving the Managing Member of liability for failure to perform his or her duties in accordance with the standards set forth herein. The satisfaction of any indemnification and any holding harmless  shall be from and limited to Company Property and the other Members shall not have any personal liability on account thereof.

7.7   Resignation; Removal of Managing Member.  The Managing Member shall have the right to resign at any time, but may not be removed by the Members other than by a vote of all of the Members, excluding the Managing Member who is the subject of the removal vote.

## ARTICLE VIII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1   Initial Contributions.  Each Member shall make the Initial Capital Contribution described for that Member on Schedule A at the time and on the terms specified in Schedule A and shall perform that Member's Commitment, and shall receive the number of Units of Membership Interest and Sharing Ratio described for that Member on Schedule A.  The Managing Member shall issue certificates representing the Units subscribed for by the Members.  No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement.  In addition to those Capital Contributions already properly reflected on the books and records of the Company, Steve Kantor, Stratis Morfogen and David Lee agree to make whatever Capital Contributions in cash as are necessary for the completion of construction/build-out of Philippe-Boca restaurant (at 200 East Palmetto Road, Boca Raton, FL. 33432) as a turn-key operational restaurant and ready for opening, including necessary working capital, if any.  Such Capital

Contributions shall be deemed a part of the Initial Capital Contributions of Kantor, Morfogen and Lee and shall (i) not impact the Units, Sharing Ratios or Membership Interests of any other Members, and (ii) be properly reflected in the Capital Accounts of Kantor, Morfogen and Lee.

8.2    Additional Contributions.   In addition to the Initial Capital Contributions, the Members may make such Additional Contributions (in accordance with their respective Additional Contribution Shares) as shall be determined by the Managing Member with the unanimous consent of all the Members.   Upon making such a determination, the Managing Member shall give written Notice, setting forth the amount of the proposed Additional Contribution, the purpose for which it is needed, and the proposed contribution date, to all Members at least ten Business Days prior to such contribution date.   Upon the unanimous agreement of the Members, the Members shall make such Additional Contributions in accordance with such agreement.

8.3    Enforcement of Commitments.   In the event any Member (a Delinquent Member) fails to perform the Delinquent Member's Commitment, the Managing Member shall give the Delinquent Member a notice of such failure.   If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the Managing Member may take such action as he deems appropriate, including but not limited to enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in the Agreement. Each Member expressly agrees to the jurisdiction of such courts but only for purposes of such enforcement.

8.4    Capital Account.   A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of Section 1.704-1(b)(2)(iv) of the Tax Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)    To each Member's Capital Account there shall be credited:

(i)    the amount of money contributed by such Member to the Company (including liabilities of the   Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations);

(ii)    the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under   Section 752 of the Code); and

(iii) such Member's share of Profits and items of income and gain that are specially allocated.

(b)     To each Member's Capital Account there shall be debited:

(i)  the amount of money distributed to such Member  by the Company (including liabilities of such Member  assumed by the Company as provided in Section  1.704-1(b)(2)(iv)(c) of the Tax Regulations) other than  amounts which are in repayment of debt obligations of the  Company to such Member;

(ii) the fair market value of property distributed  to such Member (net of liabilities secured by such  distributed property that such Member is considered to  assume or take subject to under Section 752 of the Code);  and

(iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

(c)     The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(d)     In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any  other applicable provisions of the Code and Tax Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a manner consistent with such Tax Regulations. In the event the Managing Member shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Tax Regulations, the Managing Member may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XIII hereof upon the dissolution of the Company. The Managing Member also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Tax Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Tax Regulations.

8.5    No Obligation to Restore Deficit Balance. Except as required by law, no Member shall be required to restore any deficit balance in its Capital Account.

8.6    Withdrawal; Successors. A Member shall not be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as specifically provided in the Agreement, and no Member shall be entitled to make any capital contribution to the Company other than the Commitments. Any Member, including any additional or Substitute Member, who shall receive an interest in the Company or whose interest in the Company shall be increased by means of a transfer to it of all or part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired except as otherwise required to account for any step up in basis resulting from a termination of the Company under Section 708 of the Code by reason of such interest transfer.

8.7    Interest. No Member shall be entitled to interest on such Member's Capital Contribution or on any Profits retained by the Company.

8.8    Investment of Capital Contributions.    The Capital Contributions of the Members shall be invested by the Managing Member in demand, money market or time deposits, obligations, securities, investments or other instruments constituting cash equivalents, until such time as such funds shall be used by the Managing Member for Company purposes. Such investments shall be made by the Managing Member for the benefit of the Company.

8.9    No Personal Liability.    The Managing Member shall have no personal liability for the repayment of any Capital Contributions of any Member.


ARTICLE IX
ALLOCATIONS AND DISTRIBUTIONS

9.1    Profits and Losses.    Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article IX.

9.2    Profits.    After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Profits for any Fiscal Year shall be allocated in the following order of priority:

(a)    First, to the Members, if any, who received any allocation of Losses under Section 9.3(c), in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to such Members pursuant to Section 9.3(c) for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Members pursuant to this Section 9.2(a) for all prior Fiscal Years;

(b)    Second, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(b) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to each Member pursuant to this Section 9.2(b) for all prior Fiscal Years;

(c)    Third, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(a)(ii) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Member pursuant to this Section 9.2(c) for all prior Fiscal Years;

(d)  Fourth, the balance of the Profits remaining, if any, among the Members, pro rata, in proportion to their respective Sharing Ratios.

9.3    Losses.  After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Losses shall be allocated as set forth in Section 9.3(a), subject to the limitation in Section 9.3(b) below, and, if applicable, as provided in Section 9.3(c).

(a)  Losses for any Fiscal Year shall be allocated in the following order of priority:

(i)  first, to the Members in proportion to and to the extent of the excess, if any, of (A) the cumulative Profits allocated to each such Partner pursuant to Section 9.2(d) hereof for all prior Fiscal Years, over (B) the cumulative Losses allocated to such Partner pursuant to this Section 9.3(a)(i) for all prior Fiscal Years, and

(ii) the balance, if any, among the Members in proportion to their respective Sharing Ratios.

(b)  The Losses allocated pursuant to Section 9.3(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.3(a) hereof, the limitation set forth in this Section 9.3(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations.

(c)  In the event that there are any remaining Losses in excess of the limitations set forth in Section 9.3(b), such remaining Losses shall be allocated among the Members in proportion to their respective Sharing Ratios.

9.4    Special Allocations.  The following special allocations shall be made in the following order:

(a)  Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(f) of the Tax Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Tax Regulations Section 1.704-2(g) of the Tax Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Tax Regulations. This Section 9.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Tax Regulations and shall be interpreted consistently therewith.

(b)  Partner Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i)(4) of the Tax Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Tax Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Tax Regulations.  This Section 9.4(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Tax Regulations and shall be interpreted consistently therewith.

(c)  Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Tax Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.4(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.4(c) were not in this Agreement.

(d)   Gross Income Allocation.  In the event any Member  has a deficit Capital Account at the end of any Fiscal Year  which is in excess of the sum of the amounts such Member is  deemed to be obligated to restore pursuant to the penultimate  sentences of  Sections  1.704-2(g)(1)  and  1.704-2(i)(5)  of  the   Tax Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.4(d) shall be made only if and to the extent that  such  Member  would  have  a  deficit  Capital  Account  in excess of such sum after all other allocations provided for in this Article IX have been  made as if Section 9.4(c) and this Section 9.4(d) were not in this Agreement.

(e)   Nonrecourse Deductions.   Nonrecourse Deductions  for any  Fiscal  Year  shall  be  specially  allocated  among  the Members  in proportion to their Sharing Ratios.

(f)     Partner   Nonrecourse   Deductions.     Any   Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated  to  the  Member  who  bears  the  economic  risk  of  loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Tax Regulations.

(g)   Mandatory  Allocations  Under  Section  704(c)  of  the Code.   Notwithstanding   the   foregoing   provisions   of   this Section   9.4,  in  the  event  Section  704(c)  of  the  Code  or Section  704(c)   of  the  Code  principles  applicable  under Section   1.704-1(b)(2)(iv)  of  the  Tax  Regulations  require allocations  of  Profits  or  Losses  in  a  manner  different  than that  set  forth   above,  the  provisions  of  Section  704(c)  of the  Code  and  the   Tax  Regulations  thereunder  shall  control such  allocations   among  the  Members.    Any  item  of  Company income,  gain,  loss  and   deduction  with  respect  to  any property  (other  than  cash)  that   has  been  contributed  by  a Member  to  the  capital  of  the  Company   or  which  has  been revalued  for  Capital  Account  purposes   pursuant  to  Section 1.704-1(b)(2)(iv)  of  the  Tax  Regulations)    and  which  is required  or  permitted  to  be  allocated  to  such   Member  for income tax purposes under Section 704(c) of the  Code so as to  take  into  account  the  variation  between  the  tax  basis  of such  property  and  its  fair  market  value  at  the  time   of  its contribution  shall  be  allocated  solely  for  income  tax purposes in the manner so required or permitted under Section 704(c) of the Code using the "traditional method" described in   Section  1.704-3(b)  of  the  Tax  Regulations;  provided, however,   that  curative  allocations  consisting  of  the  special allocation    of   gain   or   loss   upon   the   sale   or   other disposition  of  the   contributed  property  shall  be  made  in accordance with Section  1.704-3(c) of the Tax Regulations to the  extent  necessary  to   eliminate  any  disparity,  to  the extent  possible,  between  the   Members'  book  and  tax  Capital Accounts  attributable  to  such   property;  further  provided,

however, that any other method   allowable under applicable Tax Regulations may be used for any  contribution of property as to which there is agreement   between the contributing Member and the Managing Member.

9.5     Curative Allocations.   The allocations set forth in Sections 9.4 (a) through (g) (the "Regulatory Allocations") are intended to comply with certain requirements of the Tax Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 9.5.  Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Managing Member shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Sections 9.2 and 9.3.  In exercising its discretion under this Section 9.5, the Managing Member (i) shall take into account future Regulatory Allocations under Sections 9.4(a) and 9.4(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.4(e) and 9.4(f) and (ii) may reallocate Profits and Losses for prior open years (or items of gross income and deduction of the Company for such years) among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years. This Section 9.5 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

9.6     Other Allocation Rules.

(a)    For purposes of determining the Profits, Losses, or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Section 706 of the Code and the Tax Regulations thereunder.

(b)   The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

(c)   Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of Section 1.752-3(a)(3) of the Tax Regulations, the Members' interests in Company profits are in proportion to their Sharing Ratios.

(d)   To the extent permitted by Section 1.704-2(h)(3) of the Tax Regulations, the Managing Member shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Partner.

(e)   Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(f)   For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article IX, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members.   This section 9.6(f) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(g)   Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under Section 1.752-4(b) of the Tax Regulations) bearing the economic risk of loss (within the meaning of Section 1.752-2 of the Tax Regulations) with respect to such liability unless such arrangement has been approved by all Members.   To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other Members shall be afforded the opportunity to guarantee such Member's pro rata share of such indebtedness, determined in

accordance with the Members' respective Sharing Ratios.

9.7     Minimum 1% Interest of Managing Member. Notwithstanding anything in this Article IX to the contrary other than the Regulatory Allocations, the Managing Member shall at all times have a minimum 1% allocation of each material item of income, gain, loss, deduction and credit of the Company.

9.8     Distribution of Net Cash Flow.

(a) Amounts and Timing.  Net Cash Flow shall be distributed to the Members in proportion to their respective shares of Profits allocated to each of them for such period (and prior periods) under Section 9.2, to the extent that such amounts have not been distributed previously under this Section 9.8. Such distributions, shall be made weekly to those persons recognized on the books of the Company as Members or as Assignees on the date of distribution.

(b)  Amounts Withheld.  All amounts withheld pursuant to the Code and Tax Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Members shall be treated as amounts distributed to the Members pursuant to this Section 9.8 for all purposes under this Agreement.   The Managing Member is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, or local government any amounts required to be so withheld pursuant to the Code and Tax Regulations or any provisions of any other federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.


ARTICLE X
TAXES


10.1 Tax Matters Partner.  The Managing Member shall be the Tax Matters Partner of the Company pursuant to Section 6231(a)(7) of the Code.  The Managing Member shall not resign as the Tax Matters Member unless, on the effective date of such resignation, the Company has designated another Member as Tax Matters Member and such Member has given its consent in writing to its appointment as Tax Matters Member.  The Tax Matters Member shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Member in such capacity shall be borne by the Company.  The Tax Matters Member is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties.  In addition, the Managing Member shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

10.2   Mandatory Section 754 Election.   Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the distribution of any Company Property to one or more Members, the Managing Member, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Section 734 or Section 743 of the Code, as the case may be.   The cost of preparing such election, and any additional accounting expenses of the Company occasioned by such election, shall be borne by such transferees or distributees.

ARTICLE XI

TRANSFER OF MEMBERSHIP INTEREST

11.1   Compliance with Securities Laws.   No Unit of Membership Interest has been registered under the Securities Act of 1933, as amended, or under any applicable state securities laws.   A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) all or any part of such Member's Units of Membership Interest, except upon compliance with the applicable federal and state securities laws. The Managing Member shall have no obligation to register any Member's Units of Membership Interest under the Securities Act of 1933, as amended, or under any applicable state securities laws, or to make any exemption therefrom available to any member.

11.2   Transfer of Economic Interest. The right to receive allocations of Profits and Losses and to receive Distributions may not be transferred in whole or in part unless the following terms and conditions have been satisfied.

The transferor shall have:

(a) assumed all costs incurred by the Company in connection with the transfer;

(b) furnished the Company with a written opinion of counsel, satisfactory in form and substance to counsel for the Company, that such transfer complies with applicable federal and state securities laws and the Agreement and that such transfer, for federal income tax purposes, will not cause the termination of the Company under Section 708(b) of the Code, cause the Company to be treated as an association taxable as a corporation for income tax purposes or otherwise adversely affect the Company or the Members; and

(c) complied with such other conditions as the Managing Member may reasonably require from time to time.

Transfers will be recognized by the Company as effective only upon the close of business on the last day of the calendar month following satisfaction of the above conditions. Any transfer in contravention of this Article XI and any transfer which if made would cause a termination of the Company for federal income tax purposes under Section 708(b) of the Code shall be void ab initio and ineffectual and shall not bind the Company or the other Members.

11.3   Transfer of Membership Interest and Admission of Substitute Member. Except for the right to receive allocations of Profits and Losses and to receive Distributions, a Membership Interest of any Member may not be transferred in whole or in part, and a transferee shall not have a right to become a Member unless the following terms and conditions have been satisfied:

(a)   All of the other Members shall have consented in writing to the transfer and substitution, which consent may be arbitrarily withheld by any such Member;

(b)   The transferee shall have assumed the obligations, if any, of the transferor to the Company, including the obligation to fulfill the pro rata portion of the transferor's then existing or subsequently arising Commitment allocable to the transferred Unit of Membership Interest or portion thereof; and

(c)   The transferor and the transferee shall have complied with such other requirements as the non-transferring Members may reasonably impose, including the conditions that the transferee:

(i)    adopt and approve in writing all the terms and provisions of the Agreement then in effect; and

(ii) pay such fees as may be reasonable to pay the costs of the Company in effecting such substitution.

11.4   Status of Transferee.  A transferee of a Unit of Membership Interest who is not a Substitute Member shall be entitled only to receive that share of Profits, Losses and Distributions, and the return of Capital Contribution, to which the transferor would otherwise be entitled with respect to the interest transferred, and shall not have the rights of a Member of the Company under the Act or this Agreement including without limitation the right to obtain any information on account of the Company's transactions, to inspect the Company's books or to vote with the Members on, or to grant or withhold consents or approvals of, any matter. The Company shall, however, if a transferee and transferor jointly advise the Company in writing of a transfer of the Unit of Membership Interest, furnish the transferee with pertinent tax information at the end of each Fiscal Year.

11.5   Death, Dissolution, Bankruptcy or Incompetency of a Member.    Upon  the  death,  dissolution,  adjudication  of bankruptcy or adjudication of incompetency of a Member, such Member's  successors,  executors,  administrators  or  legal representatives shall have all the rights of a Member (except as provided by the last sentence of this Section 11.5) for the purpose  of  settling  or  managing  such   Member's  estate, including such power as such Member possessed to substitute a successor as a transferee of such Member's interest in the Company and to join with such transferee in making the application  to  substitute  such  transferee  as  a  Member. However, such successors, executors, administrators or legal representatives will not have the right to become a Substitute Member in the place of their predecessor in interest unless all of the other Members shall so consent as provided in Section 11.3(a) hereof.

11.6   Dispositions not in Compliance with this Article Void.   Any attempted Disposition of a Unit of Membership Interest, or any part thereof, not in compliance with this Article shall be void ab initio and ineffectual and shall not bind the Company.

ARTICLE XII
DISSOCIATION OF A MEMBER

12.1  Dissociation.  A Person shall cease to be a Member upon the happening of any of the following events:

(a)   the withdrawal of a Member;

(b)   the bankruptcy of a Member;

(c)   in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(d)   in the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(e)   in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(f)   in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(g)   in the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

12.2   Rights of Dissociating Member.   In the event any Member dissociates prior to the expiration of the term of this Agreement:

(a)   if the Dissociation causes a dissolution and winding up of the Company under Article XIII, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that, if such Dissociation results from a withdrawal of a Member in violation of this Agreement, any Distributions to which such Member would have been entitled shall be reduced by that portion of the damages, if any, sustained by the Company as a result of the Dissolution Event and winding up that is chargeable to the Capital Accounts of the other Members;

(b)    if    the    Dissociation    does    not    cause    a
dissolution and winding up of the Company under Article XIII,
the Company shall pay to the Member, beginning within six
months of such Dissociation, an amount equal to the value of
the Member's Membership Interest in the Company.  Such amount
shall be paid in semi-annual installments over a period not to
exceed five years, together with interest at the prime rate
reported in the Wall Street Journal minus one percent (-1.0%)
adjusted semi-annually on the dates of payment.  The value of
the Member's Membership Interest shall include the amount of
any   Distributions to which the Member is entitled under the
Agreement and the fair market value of the Member's Membership
Interest as of the date of  Dissociation as determined by an
annual agreed upon price set at each annual membership meeting,
reduced by any damages sustained by the Company as a result of
the Member's Dissociation.  If the Members shall not have set
an annual agreed upon price in the preceding 18 months from the
date of Disassociation, such value shall be set by an
independent appraiser selected by the majority of the Members
in good faith.


ARTICLE XIII
DISSOLUTION AND WINDING UP

13.1  Dissolution.  The Company shall be dissolved and
its  affairs wound up, upon the first to occur of any of the
following events (each of which shall constitute a
Dissolution Event):

(a)  the expiration of the term of the Agreement,
unless  the Company is continued with the consent of all of
the  Members;

(b)  the unanimous written consent of all of the
Members;

(c)  the Dissociation of any Member, unless at the
time  of such Dissociation there are at least two remaining
Members  and the Company is continued with the consent of all
of  the   remaining Members within 180 days after such
Dissociation;

(d)  at any time when there is but one Member, the
Dissociation of such Member, or the transfer of all or part
of  the Membership Interest of such Member and the admission
or  attempted admission of the transferee of such interest as
a  Substitute Member.

13.2  Effect of Dissolution.  Upon dissolution, the
Company  shall not be terminated and shall continue until the
winding  up of the affairs of the Company is completed and a
certificate of dissolution has been issued by the Secretary
of  State of Florida.

13.3    Distribution of Assets on Dissolution.  Upon the winding up of the Company, the Managing Member (or, if there is no Managing Member then remaining, such other Person(s) designated by the Members representing at least a majority of the Members' Sharing Ratios) shall take full account of the assets and liabilities of the Company, shall liquidate the assets (unless the Managing Member determines that a distribution of any Company Property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a)    first, to the payment of the debts and liabilities of the Company to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(b)    second, to the setting up of any reserves which the Managing Member may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company.  Such reserves may be paid over by the Managing Member to an escrow agent or trustee selected by the Managing Member to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Managing Member shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)    then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's taxable year in which the liquidation occurs.  Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Managing Member.

If at the time of liquidation the Managing Member shall determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Managing Member may, in order to avoid such loss, defer liquidation.

13.4  Winding Up and Filing Articles of Dissolution.  Upon the commencement of the winding up of the Company, articles of dissolution shall be delivered by the Company to the Secretary of State of florida for filing.   The articles of dissolution shall set forth the information required by the Act.   The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining Property of the Company has been distributed to the Members.


ARTICLE XIV
MISCELLANEOUS

14.1  Notices.  Notices to the Managing Member shall be sent  to the Principal Office of the Company.  Notices to the other  Members shall be sent to their addresses set forth on Schedule  A.  Any Member may require notices to be sent to a different  address by giving notice to the other Members in accordance  with this Section 14.1.  Any notice or other communication  required or permitted hereunder shall be in writing, and shall  be deemed to have been given with receipt confirmed if and  when delivered personally, given by prepaid telegram or mailed  first class, postage prepaid, delivered by courier, or sent by  facsimile, to such Members at such address.

14.2  discounts and House Accounts.  Each Member shall receive a 20% discount on food and beverages at Philippe Boca. Each may choose to establish a house account from which the Managing Member shall bill each Member no less often than quarterly.   Each Member choosing to use his house account agrees to promptly pay such account when invoiced by the Managing Member.  The Managing Member may withhold from Article IX distributions the amount owed on a house account by a Member who has not paid the same within a reasonable time from being billed.   The Managing Members shall establish a business card or private credit card for use by the Members for such purpose.

14.3  Headings.  All Article and section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or section.

14.4   Entire Agreement.   This Agreement together with the schedules and appendices attached hereto constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

14.5   Binding Agreement.   The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

14.6   Saving Clause.   If any provision of this Agreement, or  the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this  Agreement, or the application of such provision to Persons or  circumstances other than those as to which it is held invalid,  shall not be affected thereby.  If the operation of any  provision of this Agreement would contravene the provisions of  the Act, such provision shall be void and ineffectual.

14.7   Counterparts.   The Agreement may be executed in several  counterparts, and all so executed shall constitute one  agreement, binding on all the parties hereto, even though all  parties are not signatory to the original or the same  counterpart.  Any counterpart of either the Agreement shall  for all purposes be deemed a fully executed instrument.

14.8   Governing Law.  The Agreement shall be governed by and  construed in accordance with the laws of the State of New  York.

14.9   No Membership Intended for Nontax Purposes.   The Members  have formed the Company under the Act, and expressly do not  intend hereby to form a partnership, either general or limited, under the Florida Partnership Law.   The Members do not intend to be partners one to another, or partners as to any third party.   To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.10  No Rights of Creditors and Third Parties under Agreement.   The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees.   The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.   Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with

respect to  any Capital Contribution or otherwise.

14.11 General Interpretive Principles.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)  the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)  accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles;

(c)  references herein to "Sections", "paragraphs", and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d)  a reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions;

(e)  the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)  the term "include" or "including" shall mean without limitation by reason of enumeration.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the Effective Date.


_____          _____
Stratis Morfogen                          Christopher Brantley


_____          _____

SCHEDULE A

| Name of Member | Description and Value of initial Capital Contribution | Units and Sharing Ratio |
|---|---|---|
| Steve Kantor | No additional required, subject to Section 8.1 | |
| Stratis Morfogen | No additional required, subject to Section 8.1 | |
| Philippe Chow | No additional required | 10% |
| David Lee | No additional required, subject to Section 8.1 | |
| Loni Tabatchinck | $500,000 (Landlord) | |
| Tom Prakas | $30,000 x 3% = $90,000 | 3% |
| Steve Boxer | $30,000 x 10% = $300,000 | 10% |
| Marc Bell | $28,571.43 x 7% = $200,000 | 7% |
| Mark Kleiner | $25,000 x 5% = $125,000 | 5% |
| The Family Investment Enterprises LLC | Conversion From Philippe Miami LLC | 5% |